**MARILYN S. READER**
Attorney-at-Law
94 North Chatsworth Avenue
Larchmont, New York 10538
(914) 834-9568
fax: (914) 834-5921
email: msr2@aol.com

ADMITTED TO PRACTICE IN
NEW YORK, PENNSYLVANIA, AND
NEW JERSEY

June 30, 2008

**By ECF and by Hand Delivery:**

Hon. Colleen McMahon
Judge of the United States District Court
for the Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Re: U.S. v. Mario Ramiro Aragon, 07 CR 823 (CM).

Dear Judge McMahon:

     I write this pre-sentence letter on behalf of my client, Mr. Mario Ramiro Aragon, who is scheduled to be sentenced on July 11, 2008. I request that this letter be made a part of the record. We respectfully request Your Honor to sentence Mr. Mario Ramiro Aragon to a non-guidelines sentence of 36 months incarceration.

     Mario is a 24 year old young man who pled guilty to murder for hire in violation of 18 U.S.C. § 1958, involving a very bizarre set of facts. He became entangled in this odd set of events largely due to both his demon of excessive drinking and his naivete as a peasant farmer from Guatemala. Mario's excessive drinking of alcohol and his peasant simplicity largely contributed to his exercising very poor judgment. It also made him vulnerable to the self-interested maneuvers of Gabriel, a co-worker, friend, and a confidential informant who orchestrated Mario's frustration with his brother-in-law into a contract to murder the brother-in-law.[1]

---

[1] Though we lack specific information about the confidential informant, based on this writer's experience as a criminal defense attorney, it is likely the confidential informant was working with police to reduce his sentence on a pending charge. He may have recognized he could help set up Mario and gain even greater benefit for his additional cooperation.

*U.S. v. Mario Ramiro Aragon*, 07 CR 823 (CM)                                                June 30, 2008
Defendant's Pre-sentence letter                                                                            Page 2-

**The crime:**

  For his own personal gain, the confidential informant encouraged Mario to act on a nebulous desire to kill his brother-in-law who had threatened to report Mario to Immigration authorities unless Mario stopped drinking.  After hearing Mario express a wish to kill his brother-in-law, the confidential informant saw an opportunity to gain credit for setting up Mario.  The confidential informant telephoned an undercover police officer for whom he presumably was working, and told the police officer about Mario's desire to hire someone to kill his brother-in-law.  The confidential informant then agreed to direct Mario to the undercover officer who would masquerade as a contract killer.  The confidential informant then invited Mario to his home, plied him with bottles of beer, fanned Mario's worry about his brother-in-law's threat, and told Mario he knew someone who could kill his brother-in-law for him.  In Mario's presence, the confidential informant telephoned the undercover officer pretending he was speaking to a hired killer, discussed Mario's wish to hire him to kill someone, and then passed the phone to Mario to speak to the purported hired killer.  This set into motion the criminal conduct to which Mario plead guilty.  For $500 with a $200 down payment, Mario hired the undercover officer to kill his brother-in-law, showed the undercover officer where his brother-in-law lived and identified his brother-in-law as the person he wanted killed in a photograph taken by the pretender assassin.

**Defendant's personal history and problems drinking alcohol:**

  Mario grew up in a poor family in Guatemala where he was a peasant farmer.  He barely attended school and is illiterate even in Spanish.  Except for one year when he worked in Guatemala City, Mario worked in the fields in a small, remote town in the rainforest of Guatemala.  Emblematic of his naivete, Mario does not know his date of birth and has only a general idea of when he was born.

  Since age 18, Mario has excessively consumed beer and tequilla on weekends.  In 2001, during a soccer match in his village, a bullet hit Mario and grazed his head.  It is the custom in Mario's village for the men to fire guns in the air during soccer matches.  Ever since suffering this head injury, Mario reports he has suffered from blackouts – periods of time he could not remember what he had done or said – while under the influence of alcohol.

  During his incarceration on this charge, Mario has reflected on his life and the negative impact of alcohol.  He stated to the Probation Officer, "Here I have thought a lot.  I think alcohol has been very bad for me."  Mario indicated he would like to be in an alcohol therapy program for help to stop drinking.

  Problems with alcohol run in Mario's family.  His father drank excessively and became physically abusive when drunk; Mario's brother also has a drinking problem.

U.S. v. Mario Ramiro Aragon, 07 CR 823 (CM)  June 30, 2008
Defendant's Pre-sentence letter  Page 3-

**Non-guidelines sentence:**

Probation recommends a sentence of 87 months imprisonment at the bottom end of guidelines range. We, however, respectfully submit that a non-guidelines sentence of thirty-six (36) months incarceration is more than sufficient to meet the 18 U.S.C. § 3553 purposes of sentencing based on Mario's history and characteristics, the unusual nature and circumstances of his criminal conduct, and principles of general and individual deterrence.

As this Court is well aware, the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005) restored substantial deference to a district court's determination of an appropriate sentence. As the Supreme Court recently held, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *United States v. Gall*, __ U.S. __, 128 S. Ct. 586, 596 (2007) (citing *United States v. Rita*, 551 U.S. __, 127 S. Ct. 2456 (2007). After considering the applicable Guidelines range, the court should consider "all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." *Id.* at 596-97. As the Second Circuit held in *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005), "[n]ow, with the mandatory duty to apply the Guidelines excised, the duty imposed by section 3553(a) to 'consider' numerous factors acquires renewed significance."

Section 3553(a) sets forth the guiding principle of sentencing, commonly referred to as the "parsimony clause," by stating: "The court shall impose a sentence sufficient, but not greater than necessary" to accomplish the purposes of sentencing set forth in § 3553(a)(2). Section 3553(a)(1) first directs the court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." Section § 3553(a)(2) requires the consideration of the general purposes of sentencing, including: "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Fundamentally, under *Booker*, *Crosby, Gall, Rita* and their progeny, the district court's primary concern must be to impose a just sentence.

In *Rita,* the Supreme Court urged the sentencing judge "not [to] presume that the Guidelines range is reasonable." The present case is a clear example where the Guidelines calculation results in a sentence that is far too harsh for the offense committed by someone with the history and characteristics of Mario Ramiro-Aragon.

Mario hopes to participate in programs such as the Bureau of Prison's Residential Drug Therapy Program ("RDAP"), commonly called the BOP's 500-hour residential drug program, so

*U.S. v. Mario Ramiro Aragon*, 07 CR 823 (CM)  June 30, 2008
Defendant's Pre-sentence letter  Page 4-

he will be better equipped to stop his excessive drinking after his release from prison. He realizes he becomes particularly suggestive to bad ideas when inebriated.

**Defendant's prior criminal history and immigration status:**

Mario has no previous criminal record.

In August 2006, Mario tried unsuccessfully to enter the United States. He was caught, detained in Phoenix, Arizona and deported. There currently is an immigration detention hold filed against Mario.

**Conclusion:**

The mixture of Mario's alcoholism and his peasant naivete is largely responsible for his current circumstance. He became an easy mark for a conniving confidential informant. To be clear, Mario is not claiming his innocence in making these plans. However, if Mario had gone drinking with a friend who was not a manipulative confidential informant, his venting about hating his brother-in-law would only have been words; they never would have been transformed into action and criminal conduct.

For the reasons stated above, we respectfully submit a sentence of thirty-six (36) months incarceration is more than sufficient to serve the purposes of sentencing stated in 18 U.S.C. § 3553(a). We are confident a prison term of thirty-six (36) months will deter this young defendant from ever committing another crime as well as serve as a general deterrence to others, especially considering the bizarre set of facts in this case.

The defendant also requests Your Honor to strongly recommend and direct the U.S. Bureau of Prisons ("BOP") to admit him into the BOP's 500-hour residential drug rehabilitation program and to direct BOP to designate a facility as close to his home as possible where he can participate in the residential drug therapy program. We recognize that Mario may be deemed ineligible for any BOP therapeutic programs because he is an illegal alien with an immigration hold.

On behalf of Mr. Mario Ramiro-Aragon, I thank Your Honor in advance for your consideration.

Very truly yours,

*[signature: Marilyn S. Reader]*

MARILYN S. READER

MSR:hs
cc:   AUSA Anna Skotko
       Mr. Mario Ramiro-Aragon